**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| JUDITH MICHAELIAN and ESTATE OF MARSHALL S. MICHAELIAN,<br><br>Plaintiffs,<br><br>v.<br><br>LAWSUIT FINANCIAL, INC. and MARK M. BELLO,<br><br>Defendants. | Case No. 17-13321<br>Hon. Terrence G. Berg |

## ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.    Introduction

Between 2015 and 2017, before dying unexpectedly in a plane crash, Marshall S. Michaelian, a successful endodontist from California, had invested some $800,000 with West Bloomfield, Michigan-based Defendants Mark Bello and his company, Lawsuit Financial, Inc. Lawsuit Financial is a business that extends financing to support plaintiffs' lawsuits in exchange for a portion of any eventual recovery. After Dr. Michaelian's death, his widow, Plaintiff Judith Michaelian, sought to have the investment funds returned. On her own behalf, and that of the Estate of Marshall S. Michaelian,

also Plaintiff, Judith Michaelian brings this lawsuit making a number of claims against Defendants. Defendants have now moved for summary judgment, ECF No. 25, and Plaintiffs respond with a Cross-Motion for Partial Summary Judgment, ECF No. 49.

For the reasons given below, Plaintiffs' Motion for Partial Summary Judgment is granted in part. Defendants' Motion for Summary Judgment is denied.

## II.  Background

Defendant Bello met Marshall Michaelian through a mutual friend in 2010. ECF No. 25-1 PageID.1250. According to Defendant's testimony, Dr. Michaelian invested[1] $100,000 in Lawsuit Financial in 2010. ECF No. 31-3 PageID.2986. At that time, the parties executed a contract titled "Split Funding Agreement" ("2010

---

[1] Whether this initial transfer of money to Defendants was a "loan" or an "investment" is a disputed issue in this case. The Court's use of either the term "loan" or "investment" at any given point in this Order is not intended to express an opinion or decide the issue one way or another. In the discussion below, the Court will explain its ruling on this question. Defendants—who are now of the opinion that the transaction was a loan—themselves used the term "invest" repeatedly in their earlier briefing and in the contracts related to this dispute. For example, the 2010 contract states, "(MM) wishes to invest in the cases and/or investments of LF." ECF No. 31-3 PageID.2986; *see also* ECF No. 31-2 PageID.2972 (March 27, 2015 email from Mark Bello to Marshall Michaelian: "Per our discussion and your request, these funds will be invested into the medical treatment/legal cases we spoke about and we will split profits on a non-recourse basis as we have in the past. Thanks for your investment and your confidence in our company."); ECF No. 25-2 PageID.2974 (February 5, 2016 email from Mark Bello to Marshall Michaelian stating, "I certainly acknowledge the investment.").

SFA") stating, in part, "(MM) will provide and LF will advance capital against various litigants' lawsuits in the aggregate amount of $100,000." *Id.*

In 2011, an institutional lender, Brevet Capital, wished to become Lawsuit Financial's sole investor. ECF No. 25-2 PageID.1278. Marshall received $577,847.02 as a result of Brevet's buyout, representing both "profits" and "an 8% interest factor" on "investments being purchased" by Brevet. ECF No. 31-4 PageID.2989.

In 2014, Brevet and Defendant Lawsuit Financial ended their exclusivity agreement and Lawsuit Financial again began accepting additional capital investments. *Id.* at PageID.1252. Defendant Bello reached out to Dr. Michaelian to advise him that he could invest again. *Id.* However, Dr. Michaelian did not transfer any money to Defendants during 2014. Defendant Bello maintains that he never pressured Dr. Michaelian into transferring money to him, and that they fully discussed the risk involved in the investment. *Id.* During this same period, Bello was also contacting numerous other potential investors to try to replace Brevet's capital in Lawsuit Financial so that Lawsuit Financial could continue to fund cases. ECF No. 49 PageID.4245–47. It appears from the record that only one other person, Warren G. Levenbaum, invested in Lawsuit Financial during this time period in response to Bello's solicitations. Deposition of Mark Bello, ECF No. 49-6 PageID.4515.

The parties disagree on the terms of the agreement between Dr. Michaelian and Defendants that governed their relationship beginning in early 2015. On November 6, 2014, Defendant Bello emailed Dr. Michaelian another "split funding agreement," similar to the 2010 SFA. This agreement is hereinafter referred to as "2014 SFA." The copy of the 2014 SFA in the record is dated November 10, 2014. ECF No. 1-4 PageID.61. In the first email transmitting the 2014 SFA, Defendant Bello wrote, "Attached hereto is a 'split funding agreement' similar to the one that we did 4 years ago . . . Please review and advise. If the agreement meets with you [sic] approval, please print two originals, execute them and return them to my office with a check or wire for the $400K we discussed. I will provide a fully executed original by return overnight UPS." ECF No. 31-6 PageID.2994.

Marshall replied to this email indicating that he was not able to open the document. ECF No. 31-8 PageID.2996. But on November 26, 2014, Defendant Bello emailed Marshall again, writing, "I need all you can "Marshall" up and I need it early next week, if possible . . . . You have the Split Funding Agreement. If you have Microsoft Word, all you have to do is change the amount from $400,000 to the amount you are investing; everything else stays the same." ECF No. 31-8 PageID.2998. Again, Dr. Michaelian did not actually send any money at this time and it is not clear from the record whether he

was able to open the document containing the 2014 SFA. The copy of the 2014 SFA available to the Court in the record is not signed either by Dr. Michaelian or Defendant Bello.

The 2014 SFA states, "LF is in the business of providing non-recourse financing to claimants/plaintiffs arising out of their cases. MM wishes to invest in such cases." ECF No. 49-2 PageID.4291. The 2014 SFA also contains the following language:

> Upon settlement of claimants/plaintiffs' cases, LF agrees to pay MM the amount of the principal amount advanced to claimant/plaintiff under the aforementioned PCLPA[2] and associated documents and 40% of all profits earned thereon upon payment of same to LF, by the claimaints/plaintiffs upon claimants/plaintiff's receipt of said funds from the settlement or judgment of claimants/plaintiffs' cases. LF will also receive 40% of said profits. The remaining 20% (10% from each party hereto) of all profits shall be paid into an interest bearing "loss insurance account". If a claimant/plaintiff loses his/her case, or any judgment is rendered uncollectible and/or no funds are collected on any underlying case, said "loss insurance account" shall be the reserve account used as a source of funds for repaying MM's principal amount only. LF will have no obligation to immediately repay any funds to MM and the obligation of LF to MM under this agreement as to any particular claim or case will await the availability of prospective funds in the reserve account as a source for payment to MM during the pendency of this agreement or after notice is

---

[2] PCLPA stands for "Pending Litigation Purchase Agreement." This is the agreement between LF and the plaintiffs whose lawsuits were being funded by LF. A sample agreement is in the record at ECF No. 25-2 PageID.1286.

given of withdrawal of MM's capital account. LF further guarantees that investment returns under this agreement shall be no lower than 13% per annum.

*Id.* at PageID.4292.

In plain terms, this section of the 2014 SFA prescribes a fifty-fifty split on profits from cases funded with Dr. Michaelian's investment, with one-fifth of each party's share going into a loss insurance account. The purpose of the loss insurance account is to ensure that funds are available to repay the principal amount of Dr. Michaelian's loan. Further, the agreement provides an additional "guarantee" that "investment returns under this agreement shall be no lower than 13% per annum." The 2014 SFA also includes a six-month liquidation guarantee. *Id*. at PageID.4293 ("MM has the option of receiving back all accumulated investment provided that MM gives 6 months written notice to LF.").

The 2014 SFA contains language that appears at first blush to contradict the six-month liquidation guarantee: "LF will have no obligation to immediately repay any funds to MM and the obligation of LF to MM under this agreement as to any particular claim or case will await the availability of prospective funds in the reserve account as a source for payment to MM during the pendency of this agreement or after notice is given of withdrawal of MM's capital account." *Id.* at PageID.4292. But this provision does not say MM has no right to withdraw his investment on six-months' notice, only

that LF's obligation to pay him back depends on the availability of funds in the reserve account.

Bello invited Dr. Michaelian to modify the 2014 SFA on an ongoing basis by changing the amount to be invested in paragraph 3, noting that "everything else stays the same." Nov. 26, 2014 Email from Mark Bello to Marshall Michaelian, ECF No. 49-28 PageID.4686. However, nothing in the record indicates that Dr. Michaelian did so until the 2017 SFA, which the Court discusses below.

As Dr. Michaelian had still not forwarded any funds following these earlier emails, on February 23, 2015, Defendant Bello emailed him again asking if he could "invest" in Lawsuit Financial. ECF No. 31-10 PageID.3002. This time, Dr. Michaelian told Defendant Bello that he would be able to invest as soon as his home, which was currently listed on the market, sold. *Id.* On March 12, 2015, Defendant Bello emailed again, telling Dr. Michaelian that there was a limited opportunity to invest in a portfolio of "surgical/medical" cases. *Id.* On March 25, 2015, Dr. Michaelian responded with what appears to be a confirmation that he transferred $70,000 to Bello. ECF No. 31-2. Plaintiff testified that Dr. Michaelian signed the 2014 SFA and sent it to Bello prior to wiring this initial sum, but that Bello never returned that document with his own signature. Declaration of Judith Michaelian, ECF No. 49-1. In

the confirmation email for the initial $70,000 wire, Dr. Michaelian also wrote, "Please send me our joint agreement for my records (just in case something happens to me)." *Id*. Neither at this time, nor at any time thereafter, from what the record shows, did Dr. Michaelian ever update the amount of the investment as listed on the 2014 SFA.

In response to Dr. Michaelian's $70,000 confirmation, Bello wrote, "Per our discussion and your request, these funds will be invested into the medical treatment/legal cases we spoke about and we will split profits on a non-recourse basis as we have in the past. Thanks for your investment and your confidence in our company." *Id*.

The record contains several emails after March 25, 2015 in which Bello and Dr. Michaelian discuss Dr. Michaelian wiring large amounts of money to Lawsuit Financial. For example, on May 5, 2014, Dr. Michaelian sends an email confirming that he has just wired Bello $130,000. Bello responds, "The money will be put to good use and invested wisely; I won't let you down." ECF No. 49-46 PageID.4788.

The 2014 SFA comes up again on May 29, 2015. In an email on that date, Dr. Michaelian writes to Bello, "You will receive this today.[3] In addition, I've decided to have all of the funds invested so far as well as future funds to be invested at a set 13%. I'll go back to our emails to find the funding document but it will be easier if you could send it again." ECF No. 31-14. This marked the second time in some 90 days—the first being on March 25, 2015—that Dr. Michaelian requested Bello to provide him with a copy of their written agreement, but the record does not reflect that Bello sent the 2014 SFA to Dr. Michaelian again at any time.[4]

On February 5, 2016, Dr. Michaelian sent another email to Bello that appears to describe Dr. Michaelian's understanding of the terms of their agreement: "Good Morning Mark, we did discuss two options. One was 50/50 like we had before which included time to invest the funds. Second, was a straight % starting when you received the funds. I opted for the second and you thought that was a better choice for my circumstances. (i.e [sic] less gain, but less risk).

---

[3] Dr. Michaelian does not specify what Bello "will receive [] today."

[4] In deposition testimony, Defendant Bello indicated that he had added the 13% guaranteed rate of return language to the 2014 SFA in response to Marshall's desire to choose that option. Deposition of Mark Bello, ECF No. 49-6 PageID.4522. This does not appear to be correct, however, because the 2014 SFA containing the 13% per annum guarantee was dated November 2014, and Marshall did not send the email expressing his wish to "have all funds . . . invested at a set 13%" until May 29, 2015. In addition, Bello was soliciting investors with a promise of a 13% guaranteed return in early 2014. Feb. 12, 2014 Email from Mark Bello to Rick Katz, ECF No.49-9 PageID.4616.

The timing of investing should also be close as my recall is that you wanted to take on some of the cases asap and needed the funds pronto."[5] ECF No. 25-2 PageID.1294.

On June 4, 2016, Dr. Michaelian wrote, "[W]hen I cut back [work hours] I will need to start taking funds from the account on a quarterly basis. I'm projecting $80K for the year in 2017 or $20/quarter [sic]." ECF No. 25-3 PageID.1297. The June 4, 2016 email is significant because Defendant Bello initially argued that it set a new repayment schedule for the parties' agreement concerning Dr. Michaelian's investment. Defendants' Motion for Summary Judgment, ECF No. 25-1 PageID.1263. Between March 25, 2015 and February 16, 2017, Dr. Michaelian wired Lawsuit Financial $600,000. Plaintiff's Spreadsheet of Funds Using Actual Dates Wired, ECF No. 49-44. Defendants do not dispute this accounting. Therefore, this is the amount of money that is allegedly subject to the terms of the 2014 SFA.

There is another version of the Split Funding Agreement in the record, however, which is dated March 1, 2017 ("2017 SFA"). Dr. Michaelian sent two copies of this agreement in July of 2017 to "The Entrust Group," the entity managing the Michaelians' Individual Retirement Accounts, as support for their requests to transfer funds

---

[5] The last sentence in this email appears to refer to Dr. Michaelian's March 2015 investment, because that was when Bello contacted Marshall about the "medical/legal" cases that needed financing immediately.

from each of their IRA accounts to be invested in Lawsuit Financial.[6]

The 2017 SFAs are identical to the 2014 SFA except that they do not include the six-month repayment term that was included in the 2014 SFA. Rather than providing that the investor may demand repayment on six months' notice, the 2017 SFAs contain only the provision that "LF will have no obligation to immediately repay any funds to MM and the obligation of LF to MM under this agreement as to any particular claim or case will await the availability of prospective funds in the reserve account as a source for payment to MM during the pendency of this agreement or after notice is given of withdrawal of MM's capital account." 2017 SFA, ECF No. 49-45 PageID.4753. As noted above, this last term also appears in the 2014 SFA.

On July 13, 2017, Dr. Michaelian emailed Bello that his pension administrator, The Entrust Group, would be wiring $250,000 as an "additional investment" for Lawsuit Financial, but that he was asking Bello to limit the amount to only $200,000, and to return

---

[6] Dr. Michaelian first sent two agreements that referenced investment amounts of $100,000 each on the second page. For reasons that are unclear, the IRA manager indicated that the agreement failed to include any amount for the investments being purchased. Dr. Michaelian then emailed replacement first pages for each of the agreements containing handwritten investment amounts of $125,000 in the first paragraph of each agreement. ECF No. 49-45 Page ID.4750-59. The 2017 SFAs are therefore confusing, because they reference an amount of $125,000 on the first page, and $100,000 on the second page.

$50,000 to Dr. Michaelian. ECF No. 31-24 PageID.3310. Dr. Mich-aelian's reason for structuring the transaction this way is unclear.

With the additional $200,000 allegedly invested pursuant to the 2017 SFAs, Dr. Michaelian and Plaintiff Judith Michaelian had by then invested a total of $800,000 in Lawsuit Financial. Plaintiffs argue that, taking into account the accumulation of unpaid interest, as of August 6, 2018, Defendants owed them $1,059,941.[7] ECF No. 49-44. Despite Dr. Michaelian's and Plaintiff's execution of the 2017 SFA, which clearly contemplates investment in legal cases, Bello testified that the $200,000 transfer in July 2017 was pursuant to a telephone conversation between Bello and Dr. Michaelian. During this conversation, Bello proposed to Dr. Michaelian the opportunity to "invest in a stream of toxicology test invoices that were covered by either health insurance or part of pending litigation." First Dec-laration of Mark Bello, ECF No. 49-4, PageID.4462.

It is not clear from the record which specific cases Defendant Bello funded using the Michaelians' money. In fact, Defendant Bello himself—who is also the Defendant corporation's representative—appears not to know. *See* Deposition of Mark Bello, ECF No. 49-6 PageID.5420. The record does reflect that, in addition to funding

---

[7] This figure, including interest, does not take into account that Defendants have deposited $266,000 in the Court's escrow account.

the cases contemplated by the 2014 SFA, Defendant also used Michaelian funds to purchase medical receivables, that is, debts owed to medical providers for services rendered to patients. ECF No. 49-6 PageID.4508; ECF No. 49-6 PageID.4526.

After Dr. Michaelian's death in August 2017, Plaintiff emailed Defendant Bello requesting immediate return of the portion of the July 13, 2017 wire that had not yet been invested in cases ($164,500) and distribution of payouts immediately upon settlement of cases in which Bello had invested Michaelian funds. ECF No. 31-25 PageID.3312. On September 22, 2017, Plaintiff's sons, Daniel and Marshall, Jr., along with attorney Catherine Reisterer, met with Defendant Bello to discuss the situation and they secretly recorded the meeting. Declaration of Marshall Michaelian, Jr., ECF No. 49-51 PageID.4896.[8] During this meeting, Defendant Bello maintained that the 2014 SFA was the operative agreement gov-

---

[8] Defendant has argued that Marshall, Jr.'s and Daniel's surreptitious recording of their meeting ran afoul of the federal prohibition on unauthorized wiretapping, 18 U.S.C. § 2511. However, that statute states, "It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). Because Marshall, Jr. and Daniel were parties to the communication, recording it does not appear to violate the statute.

erning the parties' obligations concerning the Michaelians' investments. Transcript of Meeting, ECF No. 49-3 PageID.4326. But Bello was unable to provide an accounting of Michaelian funds during this meeting that was satisfactory to Plaintiff. *Id*. at PageID.4325. Plaintiff therefore brought suit for injunctive relief, breach of contract, accounting, breach of fiduciary duty, fraudulent misrepresentation, silent fraud, negligent misrepresentation, innocent misrepresentation, violation of the Securities and Exchange Act of 1934 and Rule 10b-5, violation of the Securities Act of 1933, and violation of the Michigan Uniform Securities Act. Defendants filed their Motion for Summary Judgment on April 2, 2018 (ECF No. 25), and Plaintiffs filed their Motion for Partial Summary Judgment on August 6, 2018 (ECF No. 49). Plaintiffs seek summary judgment on only Counts II (breach of contract) and IX–XII (violations of federal and state securities laws).

The core of the dispute between the parties is whether the 2014 SFA controls the parties' obligations concerning the investment funds. Defendants argue that Dr. Michaelian's May 29, 2015 email abrogated *all* terms of the 2014 SFA, and created a new framework governing their relationship. Plaintiffs argue that Dr. Michaelian merely selected one of the options—the 13% annual interest guarantee—contained in the 2014 SFA and forfeited another—sharing the recovery from pending cases—leaving the remaining terms in

the 2014 SFA in full effect. While there is support in the record for the proposition that both Dr. Michaelian and Defendant Bello accepted the view that these alternative repayment options were available under the 2014 SFA,[9] the Court notes that the plain language of the 2014 SFA actually speaks of guaranteeing *both* a 40% share of "all profits earned" on any loans to a plaintiff, *and* offering a minimum return on investment of at least 13% per year, seemingly regardless of what profit is made on individual cases.

Defendant Bello's position regarding whether the 2014 SFA governs the parties' obligations has shifted over time. During the early stages of this lawsuit, Defendant Bello also maintained that the 2014 SFA controlled the parties' relationship. As late as October 19, 2017, Bello stated that he believed the 2014 SFA was the operative contract. *See* First Declaration of Mark Bello, ECF No. 15-1 PageID.429. However, Bello now maintains that Dr. Michaelian rejected the terms of the 2014 SFA, based primarily on his May 29, 2015 email. *See* ECF No. 49-47 PageID.4809. Defendants argue the May 29, 2015 email converted the investment into a loan at 13% interest per year and released Defendants from any obligation to comply with the terms of the SFAs. Defendants also argue in their

---

[9] *See* ECF No. 49-8 PageID.4615 (email from Bello to Dr. Michaelian about the terms of the 2014 SFA stating, "If you prefer a percentage guarantee approach, we can discuss that, but your return will probably end up being somewhat lower than the risk takers' returns.").

motion that Dr. Michaelian's June 4, 2016 email established a repayment term of $20,000 per quarter that replaced the six-month repayment guarantee in the 2014 SFA. At oral argument on the motion, Defendants argued instead that the new contract contained no repayment term at all, and that the Court ought to supply a reasonable term.

Bello's latest position regarding the parties' alleged abrogation of the 2014 SFA does not entirely address the impact of the 2017 SFAs on the parties' legal obligations. The 2017 SFAs contain terms nearly identical to those found in the 2014 SFA but govern a smaller portion of the money Plaintiffs sent Defendants. However, none of the extant copies of the 2017 SFA are countersigned by Defendant Bello, they are only signed by either Marshall or Judith Michaelian. Perhaps for these reasons, Defendants have focused their arguments on the 2014 SFA's validity. At oral argument, Defendants posited that the 2017 SFA is also invalid because Defendant Bello did not sign and, allegedly, had never seen it prior to this litigation. Defendants speculated at oral argument that Dr. Michaelian might have created the 2017 SFA by amending a "Word document" version of the 2014 SFA. This theory does not explain why Dr. Michaelian would have removed the six-month repayment term, favorable to him, when creating the 2017 version, nor why—if he were manipulating a Word document copy of the 2014 SFA—the amount of

$125,000 was hand-written in. And perhaps most significantly, Defendants' claim that in 2017 Dr. Michaelian adopted a copy of the 2014 SFA, unilaterally amended its terms, and then signed it in connection with a sum of money he invested with Bello, is inconsistent with Defendants' argument that Dr. Michaelian had previously rejected the terms of the 2014 SFA and intended to operate under a completely different set of terms. Regardless, Defendants presented this theory only in oral argument, not in sworn testimony.

Defendant Bello does concede that he and his company did not maintain the "Loss Insurance Account" as required under the SFAs. This is significant because the purpose of that account was to ensure that funds would be available to allow Dr. Michaelian to recover the principal amount of his investment. Defendants' Response to Plaintiffs' Request for Admissions, ECF No. 49-7 PageID.4607. Defendants also admit that they did not keep a separate account holding the Michaelian's funds, *Id.* at PageID.4600, and did not comply with the securities registration law Plaintiffs have sued them for violating. *Id.* at PageID.4603.

## III.   Standard of Review

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden to show that there is an absence of evidence to support Defendant's case. *Selby v. Caruso*, 734 F.3d 554 (6th Cir. 2013); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party "may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Ellington v. City of E. Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012).

Plaintiff seeks summary judgment on the breach of contract claim (Count II) and on the violation of securities laws claims (Counts IX–XII). Defendant seeks summary judgment on all counts

in the Complaint. However, neither party addresses the injunctive relief Plaintiff requests in Counts I and III in their respective motions. The Court therefore examines only Counts II, IV, and V–XIII below.

## IV. Analysis

### a. Count II, Breach of Contract

"Michigan law requires a party claiming a breach of contract to prove the existence and terms of a contract, that the defendant breached its terms, and that the breach caused damages to the plaintiff." *Van Buren Charter Twp. v. Visteon Corp.*, 904 N.W.2d 192, 202 (Mich. Ct. App. 2017).

#### i. Existence and terms of a contract

As stated above, Plaintiff argues that the 2014 SFA, as modified by the parties' agreement that Dr. Michaelian would forgo any returns above 13%, was a valid contract between the parties. Defendant argues that Dr. Michaelian rejected the entire 2014 SFA in favor of granting Bello a loan with a 13% interest rate. The parties agree on the operative facts, but they differ on what those fact mean in determining their legal rights and responsibilities. "It is [] well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide." *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 296 (2010). Here

again, the parties do not raise factual disputes concerning their conduct or their actions. They essentially agree on what happened; they disagree on what legal consequences flow from what happened. So there is no genuine issue of material fact—all that remains is the question of law as to whether the 2014 SFA is the contract governing the obligations of the parties or whether a different contract existed that Defendant argues was operative.

"A valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Innovation Ventures v. Liquid Manufacturing*, 885 N.W.2d 861, 871 (Mich. 2016). In this case, mutuality of agreement is the disputed element—Defendant argues that the parties did not agree to be bound by the terms of the 2014 SFA, and Plaintiff maintains that they did.

The copy of the 2014 SFA in the record is not signed by either party. Defendant claims he never signed it; Plaintiff cannot say whether or not Defendant did. Plaintiff did testify that Dr. Michaelian signed the 2014 SFA. Declaration of Judith Michaelian, ECF No. 49-1. But because Plaintiff urges that the 2014 SFA was the operative agreement, the Court takes all inferences in Defendant's favor, assuming that Defendant never signed the 2014 SFA. "While a signature ordinarily shows assent, a valid and enforceable agreement can exist without a signature. 'Parties may be bound by the

terms of an unsigned contract when their actions demonstrate assent to the agreement.'" *Select Rehabilitation, LLC v. Sana Health, Inc.*, No. 17-13734, 2018 WL 2009578, at *3 (E.D. Mich. Apr. 30, 2018) (interpreting Michigan law) (quoting *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 624 (6th Cir. 2000)). And "[i]t is the objective manifestation of assent that is determinative, not the subjective intention of the party." *Id.* (citing *Detroit Tigers, Inc. v. Ignite Sports Media, LLC*, 203 F. Supp. 2d 789, 796 (E.D. Mich. 2002)). "[A] signature is not always essential to the binding force of an agreement. Whether a writing constitutes a binding contract, even though it is not signed, or whether the signing of the instrument is a condition precedent to its becoming a binding contract usually depends on the intention of the parties." *Detroit Tigers*, 203 F. Supp. 2d at 796 (quoting *Lynge v. Kunstmann*, 94 Ill. App. 3d 698, 694 (1981)); *Ayar v. Baymont Inns, Inc.*, No. 245775, 2004 WL 842502, at *2 (Mich. Ct. App. Apr. 20, 2004) ("In deciding whether a party has assented to a contract, we follow the objective theory of assent, focusing on how a reasonable person in the position of the promisee would have interpreted the promisor's statements or conduct.") (citation omitted).

Plaintiffs bear the burden of proving that the contract they seek to enforce exists. *Kamalnath v. Mercy Memorial Hosp. Corp.*, 487 N.W.2d 499, 504 (Mich. Ct. App. 1992). The Court must therefore

examine the conduct of the parties to determine whether Plaintiffs have shown that the 2014 SFA was a valid contract, notwithstanding the absence of signatures. A review of the conduct of the parties makes it clear that they intended the terms of the 2014 SFA to apply to the transaction.

The Second Restatement of Contracts provides:

> Conduct as Manifestation of Assent
>
> (1) The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act.
>
> (2) The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.
>
> (3) The conduct of a party may manifest assent even though he does not in fact assent. In such cases a resulting contract may be voidable because of fraud, duress, mistake, or other invalidating cause.

Restatement 2d Contracts, § 19.

"It is hornbook law that a valid contract requires a 'meeting of the minds' on all the essential terms . . . 'Meeting of the minds' is a figure of speech for mutual assent." *Kamalnath*, 487 N.W.2d at 504 (citations omitted). And "[t]he contract of a party in making performance in pursuance of a definite proposition is an acceptance of the proposition." *Malooly v. York Heating & Ventilating Corp.*, 258

N.W. 622, 626 (Mich. 1935) (quotation marks and citations omitted).

As early as March 7, 2014, Bello was referencing the terms of the 2014 SFA to explain the parties' prospective relationship to Dr. Michaelian. Emails Between Marshall Michaelian and Mark Bello, ECF No. 49-8 PageID.4615. Bello referenced the contract again on May 30, 2014 in an email to Dr. Michaelian stating, "Send [sic] you Agreement almost a month ago, never heard back. Status? Problem? Please advise." ECF No. 49-46 46 PageID.4768. Dr. Michaelian responded on June 2, 2014, stating "My cursory look at the contract did lead to some questions and I'll try to call you for clarification between Tue and before we leave on Sun." *Id*. On July 9, 2014, Dr. Michaelian emailed Bello again, stating, "[H]ave not receive the new contract as we had discussed. Are you still interested?" *Id*. In response, Bello emailed, "Marshall: This is becoming a struggle for me. I'm trying to juggle many interested investors and make them all happy. I need to talk to you. When is a good time?" *Id*. at PageID.4772.

But four months later, on November 6, 2014, Bello again emailed the 2014 SFA to Dr. Michaelian, indicating that this agreement was the operative one. *Id*. at PageID.4774. On March 27, 2015, after Bello received the first of Dr. Michaelian's investments, he wrote, "Per our discussion and your request, these funds will be invested

into the medical treatment/legal cases we spoke about and we will split profits on a non-recourse basis as we have in the past." *Id.* at PageID.4786. During the recorded meeting between Bello, Marshall, Jr., Daniel Michaelian, and Plaintiff's attorney, Bello at first equivocates, but ultimately admits that the SFA was controlling. He states, "I don't think there's a split funding agreement . . . relating to—related to all of the money I have. Having said that, in front of your lawyer, I will tell you it doesn't matter to me. The split funding agreement sets the terms for our relationship for all of the money I have of his.  Whether I have 1 or 16, that does codify in my judgment my relationship with your dad." ECF No. 49-3 PageID.4326.[10] Time and again, even during the early stages of this lawsuit, Defendant Bello indicated that he believed the terms of the 2014 SFA controlled the relationship between the parties.

The record  thus contains evidence of mutual assent from both parties. That evidence includes Bello's own statements, which clearly rely upon the 2014 SFA as being operative throughout the course of the parties' relationship.

Dr. Michaelian's course of conduct supports the same conclusion. He continued to send money to Bello and compile spreadsheets showing his "account" information. Deposition of Mark Bello, ECF

---

[10] Bello later states during this recorded meeting, "I'm telling you the agreement in that document is the agreement." *Id.* at Page ID.4327.

No. 49-6 PageID.4527; *e.g.*, February 5, 2016 Email from Marshall Michaelian to Mark Bello, ECF No. 49-41 PageID.4742. The record shows no other communication between the parties about the terms of the contract between March and May of 2015 other than the 2014 SFA. That conduct demonstrates Dr. Michaelian's assent to the terms.

Dr. Michaelian's May 29, 2015 email specifying that he wanted a 13% guaranteed return on his investment is also consistent with the terms in the 2014 SFA, indicating that he continued to rely on that document as codifying the relationship. In this very same email Dr. Michaelian requested the "funding document" from Bello—a term that can only plausibly refer to the 2014 SFA in this context. Dr. Michaelian's writing shows that he viewed the "funding document" as providing the 13% guarantee. As noted previously, the Court determines whether a party has assented to a contract by asking whether a reasonable person in the promisee's position would believe that the promisor was agreeing to be bound by the contract. A reasonable person in Bello's position would know that Dr. Michaelian had agreed to the contract because the 13% guaranteed return term *was in the contract Bello himself had drafted and sent to Dr. Michaelian* only six months prior. Even later in the relationship, in July 2017, when Dr. Michaelian sent an additional

$250,000 to Bello, he provided the 2017 SFA as proof of the transaction to his fund administrator. Both Dr. Michaelian and Plaintiff signed the 2017 SFA with substantially the same terms as the 2014 SFA, including the guaranteed 13% return.

Even taking all inferences in Bello's favor, it is demonstrably clear that both he and Dr. Michaelian manifested assent to the 2014 SFA through their course of conduct.

Conversely, Defendants urge the Court to find that Dr. Michaelian's May 29, 2015, February 5, 2016, and June 4, 2017 emails operated to form a different contract—one for a loan at 13% interest with a repayment term of $20,000 per quarter.[11] The three emails relied upon by Defendants are reproduced in pertinent part in the following figures.

May 29, 2015 email:



Case 2:17-cv-13321-TGB-MKM   ECF No. 49-40   filed 08/06/18   PageID.4741   Page 1 of 1

**Marshall Michaelian**

| | |
|---|---|
| From: | mmichaelian@comcast.net |
| Sent: | Friday, May 29, 2015 9:51 AM |
| To: | Mark Bello |
| Subject: | Wire Just sent |

You will receive this today.  In addition, I've decided to have all of the funds invested so far as well as future funds to be invested at a set 13%.  I'll go back to our emails to find the funding document but it will be easier if you could send it again.  Let me know.

Regards,
Marshall Michaelian

---

[11] At oral argument, Defendants changed course and argued that the $20,000 per quarter figure was a withdrawal request, not a repayment plan. Defendants instead asked the Court to supply a reasonable repayment term.

## February 5, 2016 email:

**Marshall Michaelian**

| | |
|---|---|
| From: | mmichaelian@comcast.net |
| Sent: | Saturday, June 4, 2016 10:27 PM |
| To: | Bello, Mark |
| Subject: | Re: Possible Funding |

Good Morning Mark, how are you? I hope all is well with you and your family.

After practicing for 37 years, I'm finally turning over my own operation to my son who is going to take over and I'll work for him as an associate at the beginning of 2017. I'll probably work 1 day a week in the Bay Area, plus one week day in Fresno, CA. As such I plan to up my investment by $200k at the beginning of the year. Let me know if this will work for you.

As I mentioned a couple of years ago, when I cut back I will need to start taking funds from the account on a quarterly basis. I'm projecting $80K for the year in 2017 or $20/quarter. I will send you quarterly stmts showing interest earned and disbursements so you can confirm each quarterly balance. In addition other current investments will be liquidated and my investment will increase.

Judy and I plan to make a trip back east late Sept (on our way to Boston) and I plan to stop off to see you and Kathy Asselstine. Let me know if you have any travel plans.

Regards,
Marshall Michaelian

## June 4, 2017 email:

**Marshall Michaelian**

| | |
|---|---|
| From: | Mark Bello <lawsuitllc@yahoo.com> |
| Sent: | Friday, February 5, 2016 11:50 AM |
| To: | mmichaelian@comcast.net |
| Subject: | Re: Account balance as of Dec 31, 2015 |

OK. You da' man!

**Mark M. Bello**
**CEO/General Counsel**
**Lawsuit Financial, Inc.**
**248-702-6022**

On Friday, February 5, 2016 11:47 AM, "mmichaelian@comcast.net" <mmichaelian@comcast.net> wrote:

Good Morning Mark, we did discuss two options. One was 50/50 like we had before which included time to invest the funds. Second, was a straight % starting when you received the funds. I opted for the second and you thought that was a better choice for my circumstances. (i.e less gain, but less risk). The timing of investing should also be close, as my recall is that you wanted to take on some of the cases asap and needed the funds pronto. Cheers,

Marshall Michaelian

There are several reasons why Defendants' interpretation that these emails formed a new contract is implausible.

First, given the amount of the investment, a repayment schedule at the rate of $20,000 per quarter with 13% interest accruing annually would never be sufficient to repay Plaintiffs for the entire sum of money invested in Lawsuit Financial.[12] It is extremely unlikely that Dr. Michaelian meant to give Lawsuit Financial a loan *forever*—and even Defendants do not subscribe to that position. And the conduct of the parties does not indicate that they intended the $20,000 withdrawal to be a binding term governing loan repayment. Instead, Dr. Michaelian's June 4, 2017 refers to a $20,000 per quarter "withdrawal" as the amount he anticipated withdrawing from his investment with Bello at the time. There is no evidence that Dr. Michaelian intended that projection to create a binding repayment schedule, either on him or on Defendants. The email speaks of withdrawing funds invested in an account, not setting up a repayment schedule for a loan.

---

[12] To illustrate, if Dr. Michaelian had invested all $800,000 at once at a 13% per annum rate of return, during the first year of investment, the sum would earn $104,000 (13% of $800,000). $104,000 divided by four quarters works out to $26,000 per quarter. As noted below, withdrawing $20,000 per quarter could not be a "repayment" schedule for the "loan" amount, because it returns only part of the interest due. That interest would continue to accrue, and could continue to be withdrawn, without the principal ever being repaid. Dr. Michaelian's request is also consistent with paragraph 13 of the 2014 SFA, which entitles him to "receive earnings, paid quarterly *or* let[] the earnings accumulate as additional investment." ECF No. 49-2 PageID.4293 (emphasis added).

Second, as discussed extensively in the subsections above and below, the 13% interest figure was already guaranteed to Dr. Michaelian in the 2014 SFA; it was not a counter-offer or a new agreement, but relied on a clause in the existing contract.

Finally, there is also no evidence that Dr. Michaelian ever changed his expectation that his funds would be invested *in cases*. This is a critical part of Defendants' argument because, were that not a term of the contract, Defendants would have no obligation to track Dr. Michaelian's funds to ensure that the funds were invested in cases rather than used to pay the business' operating expenses. But nothing in the three emails Defendants rely on indicates that Dr. Michaelian's intent was anything other than continuing having his funds invested in pending cases.

Taking all inferences in favor of Plaintiffs—as Defendants have also requested summary judgment on this count—Defendants have not shown that the emails between the parties created a contract other than the 2014 SFA, which the Court found valid and enforceable above.

### ii. Modification or rejection of the 2014 SFA

The 2014 SFA guaranteed, at minimum, a 13% rate of return. The Court has already determined that the 2014 SFA was a valid contract because the parties mutually assented to its terms. Consequently, when Dr. Michaelian offered to forgo his right to a 40%

share of profits under one provision of the 2014 SFA in favor of a guaranteed regular 13% rate of return as allowed under another provision, he did not abrogate the original terms of the contract. For the sake of thoroughness, however, the Court briefly addresses contract modification here.

In brief, a party to a contract cannot modify that contract by restating a term already contained in the original contract—this is not "modification" at all. "It is axiomatic that parties to a contract may contract to modify the contract by a later agreement." *Adell Broadcasting v. Apex Media Sales*, 708 N.W.2d 778, 782 (Mich. Ct. App. 2005). But this axiom assumes that the proposed modification to the contract is an actual change from the original contract. Here, Dr. Michaelian's "modification" did not alter Defendants' duty to him under the contract. Therefore, Dr. Michaelian's May 29, 2015 email had no legal effect on the agreement between the parties.

### iii.  Defendant's Breach

Plaintiff details three ways in which Defendant breached the terms of the 2014 SFA: (1) Defendants used Plaintiffs' money for purposes other than funding plaintiffs' cases; (2) Defendant failed to repay the investment within six months after a request to do so; and (3) Defendant failed to maintain a loss insurance account. Defendants, while not disputing having committed these breaches, ar-

gue that they were not required to satisfy any of the three contractual provisions because the 2014 SFA was not the operative agreement.

Indeed, Bello admits that he and Lawsuit Financial did not comply with the terms of the 2014 SFA. Deposition of Mark Bello, ECF No. 49-6 PageID.5420 (admitting that Michaelian money went into Defendant LF's operating account where it was then used to pay Defendant's operating expenses in addition to funding cases); Defendants' Response to Plaintiffs' Motion to Strike Special Master Report, ECF No. 71 PageID.6560 (noting that Defendants have escrowed $266,000 for Plaintiffs' repayment, not the full amount due within six months); Defendants' Response to Plaintiffs' Request for Admissions, ECF No. 49-7 PageID.4607 (admitting that Defendants never maintained a loss insurance account).

Importantly, even if the Court accepted Defendants' conclusions of law and assumed that Dr. Michaelian's May 29, 2015 email rejected the 2014 SFA, under the undisputed facts on record, Defendants still would be in breach of the new agreement that the emails supposedly created.

As described by Defendants, the new agreement's only term was that there would be  a 13% per annum rate of return on Dr. Michaelian's investment. At oral argument, Defendant indicated that the Court ought to supply a reasonable term that would govern the

repayment schedule of this "loan." Defendant Bello told Plaintiffs' sons during the September 22, 2017 meeting that his cases tend to resolve within 15 months to 3 years, and that Dr. Michaelian was well-aware of this, so that he would not have expected repayment of the principal immediately. ECF No. 49-3 PageID.4314. And during his deposition, Bello estimated that he sees returns on case investments within approximately 13 months. ECF No. 49-6 PageID.4497.

To supply a reasonable term of repayment, as Defendants requested, the Court will assume Defendants are allowed a full three years for repayment,[13] which is the maximum amount of time Defendant Bello estimated a case would take to resolve. Applying that assumption, Defendant's obligation is summarized in the chart below, using data Plaintiffs provided and Defendant has not disputed.

---

[13] The Court finds this proposed term consistent with the understandings of the parties as demonstrated by the evidence in the record. The Court rejects Defendants' suggestion at oral argument that a 9-year repayment term should be used. As noted previously, Defendants pointed to Dr. Michaelian's June 13, 2016 email in which he states, "I didn't want to project out too many years as far as my investment is concerned, but my 'spreadsheet' estimates that by 2019, even taking out $20/qtr plus additional investment the net in Lawsuit Financial, Inc. will be around $1.2M and maybe more. Nevertheless, even if the additional funding level is not that high, my total net investment with Lawsuit does not decrease over the next 9 years." ECF No. 49-46 PageID.4794. Defendants indicated that this email should be interpreted to mean that Dr. Michaelian did not expect repayment of his investment until at least 2025. But this email clearly does not speak of a loan or of any schedule for full repayment, it simply says that Dr. Michaelian planned to leave his "investment" (a term used three times) with Lawsuit Financial for at least 9 years.

A full version of this spreadsheet is attached to this opinion as Appendix 1.

| | A | B | C | G | H | K |
|---|---|---|---|---|---|---|
| 1 | Date of Wire | Amount | Date Due | Days Since Wire | Interest as of 3/20/19 | Total Due |
| 2 | 3/25/2015 | 70,000 | 3/25/2018 | 1456 | 36303.904 | 106,304 |
| 3 | 5/5/2015 | 130,000 | 5/5/2018 | 1415 | 65522.99 | 301,827 |
| 4 | 5/29/2015 | 100,000 | 5/29/2018 | 1391 | 49547.42 | 451,374 |
| 5 | 7/24/2015 | 200,000 | 7/24/2018 | 1335 | 95105.4 | 746,480 |
| 6 | 1/1/2016 | 37,208 | 1/1/2019 | 1174 | 15559.59679 | 799,247 |
| 7 | 1/1/2017 | 70,029 | 1/1/2020 | 808 | 20155.01848 | 889,431 |
| 8 | 2/16/2017 | 100,000 | 2/16/2020 | 762 | 27142.44 | 1,016,574 |
| 9 | 7/21/2017 | 200,000 | 7/21/2020 | 607 | 43242.68 | 1,259,816 |

This spreadsheet is merely an illustration of Defendants' obligations under the theoretical contract they propose exists. Column A indicates the date of each money wire to Defendants or, in the case of Rows 6 and 7, the date of each reinvestment of interest accrued during the previous year. Column B is the amount wired or reinvested on that date. Column C indicates the date on which repayment of the "loan" would be due assuming a 3-year repayment. Column G shows the number of days that the money in each transaction has accrued interest. Column H shows the total amount of interest that has accrued at a rate of 13% per annum or 0.03562% per day (13 divided by 365 days in a year) and compounded annually. And Column K is a running total of the amount due on each date in Column C. Using a three-year repayment term, the amount due as

of March 20, 2019 is in cell K6: $799,247. (The latest "loans" from 2017—in Rows 8 and 9—would not be due until 2020.)[14]

As the table shows, even if Defendants' position were correct regarding the email-based contract, Defendants would still be in breach. As of the date of this Order, under Defendants' own purported agreement (with the Court filling in a reasonable term for repayment as Defendants requested), Defendants would owe Plaintiff at least $799,247.00. This amount has not been paid, so Defendants would be in breach if their understanding of the loan were correct.

There have been some attempts by Defendants to make payments. During his deposition, Defendant Bello implied that Defendants have been escrowing $25,000 per month in their own separate account but was unable to specify which account that was or where the money was held. ECF No. 49-6 PageID.4531. In addition, upon closer questioning he refused to confirm that he was in fact escrowing that amount, responding only, "I can't promise that." *Id.*

As noted above, Defendants paid Plaintiff $25,000 prior to Plaintiff filing her Complaint. In addition, Defendants have deposited $266,000 in escrow with the Court to be paid to Plaintiffs, totaling

[14] The Court admittedly lacks the expertise of a bank or accounting firm in the arcane art of interest calculation, but its method uses basic math that is easily checked and automatically computed by the Excel spreadsheet program.

$291,000—far less than the $799,247.00 that would have been owed if the agreement provided for 13% annual interest and repayment within three years. Defendants would therefore be in breach of the one term they claim exists in an alleged new contract created between the parties. Of course, as explained above, the undisputed facts do not support Defendants' view of the legal obligations of the parties. There was no "loan" at 13% per annum with a three-year (or any-year) repayment plan. The Court engaged in the analysis above only to show that, even if there were, the record would still compel a judgment in favor of Plaintiffs on Count II.

### iv. Damages to Plaintiff

The damage to Plaintiffs from Defendants' breach is fairly straightforward.

First, Plaintiff was entitled to all but $200,000[15] of the funds Dr. Michaelian invested in Lawsuit Financial no later than six months after she demanded it. This finding requires explanation because of the specific terms of the 2014 SFA that the Court earlier noted appear to conflict. This information is also recited in the facts section above, but the Court refreshes here for clarity. First, the contract states, "LF will have no obligation to immediately repay any funds to MM and the obligation of LF to MM under this agreement as to

---

[15] The final $200,000 investment was allegedly subject to the terms of the 2017 SFA, which did not include the six-month repayment term.

any particular claim or case will await the availability of prospective funds in the reserve account as a source for payment to MM during the pendency of this agreement or after notice is given of withdrawal of MM's capital account." ECF No. 49-2 PageID.4292. Second, the contract also states, "MM has the option of receiving back all accumulated investment provided that MM gives 6 months written notice to LF." *Id.* at PageID.4293. These terms are in harmony for two reasons. First, the six-month repayment is consistent with the term that Defendant does not have to *immediately* repay Plaintiffs. Second, the "await the availability of funds" clause refers to the loss insurance account—an account that Defendants admit they failed to maintain despite their contractual obligation to do so. Defendants cannot benefit from their own breach by arguing that because there was no money in the loss insurance account, they cannot be obligated to pay Plaintiffs any amount of Plaintiffs' principal. There is no money in the loss insurance account *because* of Defendants' breach. Consequently, the six-month repayment term applies to this dispute as the only term in the contract specifying a time at which Plaintiffs can receive back their "accumulated investment."

Pursuant to the analysis above, Plaintiff has suffered damages because she has been deprived of the use of this money for just over one year—February 17, 2018 marked six months after Plaintiff's

demand for repayment. Plaintiff has also suffered due to Defendants' failure to maintain a loss insurance account, which is a contributing factor to any liquidity shortfalls that may be preventing Defendants from fully repaying Plaintiff. And Plaintiff has suffered additional risk to her investment by Defendants' spending Dr. Michaelian's investment funds on Lawsuit Financial's operating expenses.

To determine the precise amount of damages to be included in the judgment, as set forth below, the Court will request additional briefing on damages calculations. Because the Court finds as a matter of law that the 2014 SFA was a valid contract, Plaintiffs' Motion for Summary Judgment on Count II is granted; Defendants' cross-motion is denied.

This decision applies only to the 2014 SFA, not to the 2017 SFA. There is a material fact in dispute regarding the 2017 SFA because Defendant Bello asserts that, as a factual matter, he was never aware of, and could therefore not have assented to, this agreement. Drawing all inferences in Defendants' favor, there is clearly an issue of fact that would preclude summary judgment for Plaintiffs regarding breach of the 2017 SFA. If a jury found that Bello was credible in stating that he had never seen the 2017 SFA, the 2017 SFA obviously could not, by itself, represent the agreement between the parties.

### b. Count IV, Breach of Fiduciary Duty

Claiming that their relationship with Plaintiffs was not fiduciary, Defendants seek summary judgment in their favor on Plaintiffs' claim that Defendants breached a fiduciary duty to Plaintiffs. Defendants' argument is premised on the assumption that Defendants were "borrower[s] in an arm-length loan transaction" and that Marshall Michaelian was a lender. Defendants' Motion for Summary Judgment, ECF No. 25-1 PageID.1265–66.

"[A] fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one upon the judgment and advice of another. . . . Relief is granted when such position of influence has been acquired and abused, or when confidence has been reposed and betrayed." *Vicencio v. Ramirez*, 536 N.W.2d 280, 284 (Mich. Ct. App. 1995) (citations omitted). As Defendants point out, there generally is no fiduciary obligation that runs between parties whose interests are adverse because it would not be reasonable for one party to trust the judgment of the other in that situation. *See Beaty v. Hertzberg & Golden, P.C.*, 571 N.W.2d 716, 722 (Mich. 1997). Defendants argue that the parties' supposed lender-borrower relationship renders their relationship adverse. Therefore, they argue, Defendant Bello could not have had any fiduciary duty to Plaintiff.

The Court has already determined that the 2014 SFA was a valid contract that controlled the relationship between the parties. That analysis continues to apply here; Defendants and Plaintiffs had more than a mere borrower-lender relationship because their transaction was subject to other requirements set forth in the written contracts. The written contracts do not establish that the parties' interests were adverse—presumably, the interests of all parties were aligned since greater returns to Lawsuit Financial would benefit all parties. As the record appears before the Court, a reasonable jury could find facts supporting Plaintiffs' claim that Bello breached a fiduciary duty to Plaintiffs. Defendants' Motion for Summary Judgment as to Count IV is denied.

### c. Counts V–VIII, Fraud or Misrepresentation

In Counts V–VIII, Plaintiffs allege fraudulent misrepresentation, silent fraud, negligent misrepresentation, and innocent misrepresentation. Defendants argue that, for all four claims, Plaintiffs must plead and prove "actionable misrepresentations or omissions which induced them to part with their money." Defendants' Motion for Summary Judgment, ECF No. 25-1 PageID.1267. Defendants seek summary judgment on the ground that Plaintiffs have not identified any such misrepresentations or omissions. Defendants'

statement of the law is accurate, but their characterization of the state of the evidence is not.

All four of Plaintiffs' fraud-related claims require as an element the false statement or omission of a fact that Defendants had a duty to disclose. *Foreman v. Foreman*, 701 N.W.2d 167, 175 (Mich. Ct. App. 2005) (elements of fraudulent misrepresentation include proving a false material misrepresentation); *Hord v. Environmental Research Institute of Mich.*, 617 N.W.2d 543, 550 (Mich. 2000) (silent fraud requires nondisclosure of a fact that a party had a legal duty to disclose); *see Fejedelem v. Kasco*, 711 N.W.2d 436, 437 (Mich. Ct. App. 2006) (assuming that negligent misrepresentation requires a misrepresentation); *M&D, Inc. v. W.B. McConkey*, 585 N.W.2d 33, 37 (Mich. Ct. App. 1998) (innocent misrepresentation requires a false statement).

But based on the record before the Court and the foregoing analysis, Plaintiffs *have* alleged misrepresentations or omissions. One such alleged misrepresentation is Defendants' representation that Dr. Michaelian's money would be used to fund cases, when it was really used for other purposes. Deposition of Mark Bello, ECF No. 49-6 PageID.5420. An example of an alleged material omission of fact may be found in Defendants' failure to disclose that it was not maintaining a loss insurance account. A reasonable jury could find that these statements or omissions were false and misleading and

that they induced Plaintiffs to invest in Lawsuit Financial. Defendants' Motion for Summary Judgment as to Counts V–VIII is therefore denied.

### d. Count IX, Section 10(b), Securities Exchange Act of 1934 and Rule 10b-5

Plaintiffs and Defendants both seek summary judgment on Count IX, which alleges securities fraud.

The Securities Exchange Act of 1934 prohibits "us[ing] or employ[ing], in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5, enacted pursuant to the statute, prohibits "employ[ing] any device, scheme, or artifice to defraud," "mak[ing] any untrue statement of a material fact or [ ] omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," and "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

In order to prevail in a typical § 10(b) private action, a plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

As an initial matter, Defendants' theory of the case rests primarily on their argument that the transaction at issue was a loan, rather than a security. The Court need not reach this question as to Count IX—though it will in the following subsection with respect to Count X—because several elements of a 10b-5 claim are inappropriate for summary judgment on the record before the Court. First, "[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 555 (6th Cir. 2001) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 240 (1988)). Whether a particular misrepresentation or omission is material "is a mixed question of law and fact." *Helwig*, 251 F.3d at 563 (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)). Therefore, "Courts generally reserve such questions for the trier of fact." *Helwig*, 251 F.3d at 563.

Second, "scienter" requires a showing of "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 293 (1976). A court generally should not decide "[i]ssues of motive and intent," including in § 10(b) actions, through summary judgment. *Wechsler v. Steinberg*, 733 F.2d 1054, 1058–1059 (2d Cir. 1984) (citing *Poller v. Columbia Broad. Sys., Inc.*, 386 U.S. 464, 473 (1962) (antitrust)). However, a court *may* resolve these issues if there is "overwhelming evidence" of the defendant's state of mind, such that no reasonable jury could come to the opposite conclusion. *See In re Federal Nat. Mortg. Ass'n Securities, Derivative, and ERISA Litigation*, 898 F. Supp. 2d 176, 182–83 (D.D.C. 2012).

In this case, neither party has presented evidence so overwhelming on the issues of materiality and scienter that summary judgment would be appropriate. For example, Plaintiffs have argued that Bello's misrepresentations about the purpose for which Bello used Dr. Michaelian's funds was material. But the record shows that Dr. Michaelian made very few—if any—inquiries into what Bello was doing with his money. This could suggest that a jury might find that a reasonable investor in Dr. Michaelian's position would not have considered such information significant in making the decision to invest. Similarly, Plaintiffs have argued that Bello's misrepresentations and omissions were intended to defraud Dr. Michaelian. But Bello has testified that he disclosed the risks of

investment to Dr. Michaelian. Second Declaration of Mark Bello, ECF No. 51 PageID. 5512. A jury as fact-finder must be given the opportunity to determine whether it believes that testimony is credible.

There are material facts supporting both parties' positions on Count IX that raise questions that properly belong to the jury. The parties' Cross-Motions for Summary Judgment as to Count IX are therefore denied.

### e. Count X, Sections 5(a), 5(c), and 12(a)(1), Securities Act of 1933

Plaintiffs and Defendants have also filed cross-motions for summary judgment on Count X.

Count X of Plaintiffs' Complaint alleges violations of §§ 5(a) and 5(c) of the Securities Act of 1933 (15 U.S.C. § 77e(a), (c)). These provisions prohibit using interstate commerce to sell and deliver unregistered securities. Section 12(a)(1) confers liability for losses upon a person who violates §§ 5(a) and 5(c). 15 U.S.C. § 77l.

Defendants admit that Plaintiffs' investments in Lawsuit Financial were not registered as a security. Defendants' only defense to Count X is that the transaction between Dr. Michaelian and Bello was a loan, not the sale of a security.

"The term 'security' means any note, stock . . . investment contract . . . or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing." 15 U.S.C. § 77b(a)(1).

In the subsections above, the Court determined that, as a matter of law, the 2014 SFA was a valid contract and that Dr. Michaelian's subsequent attempted modification of that contract had no legal effect. Based on that finding, the transaction between Dr. Michaelian and Bello was the sale of a security, because the 2014 SFA is an investment contract. Importantly, the guaranteed minimum 13% rate of return does not preclude a finding that the 2014 SFA was an investment contract. The Supreme Court held that "[t]here is no reason to distinguish between promises of fixed returns and promises of variable returns for purposes of the test, so understood." *S.E.C. v. Edwards*, 540 U.S. 389, 394 (2004).

"[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946). This holding affirms that the Securities Act of 1933 was meant to extend to the "countless and variable schemes devised by those who seek the use of the

money of others on the promise of profits." *Id.* at 299. The Supreme Court has broken the *W.J. Howey* test down into four elements, addressed below.

## 1. An investment

The Sixth Circuit uses the "risk capital" test to determine whether a transfer of funds was a loan or an investment. "The 'risk capital' test focuses on six criteria: 1) time; 2) collateral; 3) form of the obligation; 4) circumstances of issuance; 5) relationship between amount borrowed and size of borrower's business; and 6) intended use of the funds." *Union Planters Nat. Bank of Memphis v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1182 (6th Cir. 1981).

First, "the longer the money is held, the more probable it becomes that an investment is involved." *Id.* There was no set time for repayment in the agreement Defendants seek to characterize as a loan. Second, "[t]he existence of collateral is strongly suggestive of a commercial loan." *Id.* The agreement between the parties provided for no collateral; the only source to support repayment of the investment was the proceeds derived from the cases—the investment return itself. Third, the form of the obligation was a "return," as the parties themselves referred to it. And that return was "totally dependent upon [the borrower's] managerial and entrepreneurial efforts." *American Bank & Trust Co. v. Wallace*, 702 F.2d

93, 96 (6th Cir. 1983). These factors indicate an investment rather than a loan. Fourth, where "the participation interest was 'procured for speculation or investment,'" the circumstances of issuance suggest an investment. *Union Planters*, 651 F.2d at 1182. Based on the communications between Dr. Michaelian and Bello, that was certainly the case here. Fifth, the amount Dr. Michaelian invested represented a large portion of Lawsuit Financial's capital. And finally, Dr. Michaelian appears to have believed that the money he was wiring would "serv[e] as risk capital to obtain new productive assets." *Id.* at 1183. These factors counsel in favor of finding that the transaction was an investment, not a loan.

In *Union Planters*, the Sixth Circuit applied the risk capital test to find that an exchange of funds particularized to the needs of the borrower was a loan, rather than an investment. Here, the transaction was not tailored to meet particular business needs of Lawsuit Financial. Rather, Dr. Michaelian transferred funds so that they could be invested in plaintiff litigation. The decisions about *which* plaintiffs' cases that money was to go toward was left entirely to Bello. Bello provided assurances to that effect: "The money will be put to good use and invested wisely; I won't let you down." ECF No. 49-46 PageID.4788. Bello's many references in the record to Lawsuit Financial's "rigorous underwriting process" for plaintiffs' cases have the same effect—communicating that the profits Plaintiffs

were to expect would come from Defendants' efforts. *See, e.g.*, Email from Mark Bello to Marshall Michaelian, ECF No. 49-22 PageID.4680.

## 2. A common enterprise

The "common enterprise" element of the test for determining whether a transaction is an investment contract requires that a plaintiff demonstrate "horizontal commonality." *Deckebach v. La Vida Charters, Inc. of Fla.*, 867 F.2d 278, 281 (6th Cir. 1989). "Horizontal commonality ties the fortunes of each investor in a pool of investors to the success of the overall venture. In fact, a finding of horizontal commonality requires a sharing or pooling of funds." *Union Planters Nat. Bank of Memphis v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1183 (6th Cir. 1981) (citations omitted). The Sixth Circuit has declined to find a common enterprise where plaintiffs have failed to show "an arrangement to pool investments for common developments." *Hart v. Pulte Homes of Mich. Corp.*, 735 F.2d 1001, 1008 (6th Cir. 1984).

Plaintiffs have established horizontal commonality through evidence that Lawsuit Financial pooled funds—Bello's, Dr. Michaelian's, and Warren Levenbaum's—to advance money to plaintiffs in support of their lawsuits. The success or failure of the joint venture,

that is, the amount of money garnered from settlements or judgments in favor of plaintiffs, was equivalent to the success or failure of each individual investor.

3. Profits based on the efforts of others

"By profits, the Court has meant either capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852 (1975).

The language of the 2014 SFA shows that the agreement involved participation in earnings resulting from the use of investors' funds. In exchange for Dr. Michaelian's investment, Lawsuit Financial agreed to pay principal plus 40% of profits from plaintiffs' cases directly to Dr. Michaelian. The 13% guaranteed rate of return was also clearly premised on returns from investments in plaintiffs' cases. And these profits were meant to come from the efforts of others—namely Bello's exercising his expertise in choosing plaintiffs' cases in which to invest, and the plaintiffs' and their attorneys' successes in pursuing recovery in their lawsuits.

The 2014 SFA therefore satisfies all three prongs of the investment contract test set forth in *W. J. Howey*. As such, it was required to be registered as a security. Because it was not, Plaintiffs' Motion for Summary Judgment as to Count X must be granted.

### f. Count XI, Section 12(a)(2), Securities Act of 1933

Section 12(a)(2) of the Securities Act of 1933 confers liability on any person who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission)," and who cannot show that he did not know or should not have known of the untruth or omission. 15 U.S.C. § 77l(a)(2).

For § 12(a)(2) liability, "the central issue is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities." *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996), *cert. denied*, 520 U.S. 1264. This is a question for the jury.

As noted above, Plaintiffs have identified several of Defendants' statements that they allege are untrue. *See* Plaintiffs' Summary of Misrepresentations, ECF No. 56-1. Bello has also testified that he had oral communication with Dr. Michaelian in which he disclosed

information, including risks of the investment, that were not detailed in the written communication in the record. This creates a genuine issue of material fact as to whether a reasonable investor would have been misled into investing in Lawsuit Financial based on Defendants' statements. A jury must weigh this evidence and determine this issue of fact. Consequently, the cross-motions for summary judgment as to Count XI are denied.

### g. Count XII, Michigan Uniform Securities Act

Both sides have moved for summary judgment on Count XII. Plaintiffs' Amended Complaint alleges that Defendants violated § 501 of the Michigan Uniform Securities Act (MUSA). Section 501 reads:

It is unlawful for a person, in connection with the offer, sale, or purchase of a security or the organization or operation of a Michigan investment market under article 4A, to directly or indirectly do any of the following:

(a) Employ a device, scheme, or artifice to defraud.
(b) Make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.
(c) Engage in an act, practice, or course of business that operates or would operate as a fraud or deceit on another person.

Mich. Comp. Laws § 451.2501(a)–(c).

In Defendants' Response to Plaintiffs' Motion for Summary Judgment, Defendants cite several exemptions, arguing that they cannot be liable for violating § 501 because the transactions fall within these statutory exemptions. ECF No. 51 PageID.5504. However, the exemptions listed come from § 451.2201, which exempts certain securities from the registration requirement, *not* from the prohibitions on fraud and material misrepresentations and omissions in § 501.

Because the language of MUSA "tracks the federal securities laws and regulations," courts have interpreted the relevant standards to be similar. *See JAC Holding Enters., Inc. v. Atrium Capital Partners, LLC*, 997 F. Supp. 2d 710, 739 (E.D. Mich. 2014); *see also Dep't of Commerce v. DeBeers Diamond Investment, Ltd.*, 280 N.W.2d 547, 550 (Mich. Ct. App. 1979) ("While the interpretation Federal courts have placed upon terms under the Federal securities acts is not binding upon state courts as they interpret the Uniform Securities Act, the similarity of the purpose and provisions of the state and Federal securities statutes . . . cannot be ignored." (citing federal securities law to interpret MUSA)). Accordingly, the Court's analysis of Count XII tracks its analysis of Count XI—whether Defendants materially misrepresented facts that would induce a reasonable person to invest is a question of fact for the jury. The cross-motions for summary judgment as to Count XII are denied.

### h. Count XIII, Section 215, Investor Advisors Act

Defendant seeks summary judgment as to Count XIII. The Investor Advisors Act states:

> It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
> (1) to employ any device, scheme, or artifice to defraud any client or prospective client;
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

15 U.S.C. § 80b-b(1)–(2). Defendants do not dispute that they acted as investment advisors. Instead, their Motion for Summary Judgment argues that Plaintiffs have failed to provide evidence of fraud.

The Court's previous discussion of the questions of fact surrounding whether Defendants engaged in fraudulent conduct with respect to Counts V–VIII and XI–XII applies with equal force here. Whether Defendants defrauded Plaintiffs is a question for the jury. Plaintiffs have presented evidence raising triable question as to whether Defendants made material misrepresentations. Defendants' motion as to Count XIII is denied.

### V.    Conclusion

For the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment is **GRANTED in part** as to Counts II and X and **DENIED in part** as to Counts IX, XI, and XII. Defendants' Motion for Summary Judgment is **DENIED**.

Plaintiffs are **ORDERED** to submit additional briefing on the issue of damages for the judgment in Plaintiffs' favor on Counts II and X of no more than seven (7) pages, within fourteen (14) days of the date of this Order. Defendants are **ORDERED** to respond in no more than seven (7) pages, no later than twenty-eight (28) days from the date of this Order.

**SO ORDERED.**

Dated:  March 20, 2019          s/Terrence G. Berg
                                TERRENCE G. BERG
                                UNITED STATES DISTRICT JUDGE

**Certificate of Service**

I hereby certify that this Order was electronically filed, and the parties and/or counsel of record were served on March 20, 2019.

s/A. Chubb
Case Manager